UNITED STATES OF AMERICA

WORCESTER, SS.

U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No.

| | |
|---|---|
| JOSE HERRERA BETANCOURT<br>        Plaintiff<br><br>v.<br><br><br>JOHN J. GRADY, MICHAEL FOLEY,<br>PAUL KEYES, THE CITY OF<br>WORCESTER - A MUNICIPAL<br>CORPORATION, KEVIN FIFIELD,<br>U.S. SECURITY ASSOCIATES, INC.,<br>WINN MANAGMENT, INC.<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **05-40154 FDS** |

## COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION

1.   This is an action for money damages against the City of Worcester, and Worcester Police Officers John Grady, Michael Foley, Paul Keyes, and security officer Kevin Fifield for violations of the plaintiff's constitutional rights and for other state torts. The plaintiff has additional claims against various corporate defendants alleging a variety of torts.

### JURISDICTION

2.   This action is brought pursuant to 42 U.S.C. §§ 1983, and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and 28 U.S.C. §§ 1367 provides supplemental jurisdiction over the state law claims.

### PARTIES

3.   Plaintiff, Jose Herrera Betancourt, ("Herrera Betancourt") is and was at all material times herein a citizen of the United States and a resident of Putnam, Connecticut.

RECEIPT # _104649_
AMOUNT $_250.00_
SUMMONS ISSUED_7_
LOCAL RULE 4.1_✓_
WAIVER FORM_____
MCF ISSUED_✓_
BY DPTY. CLK._KH_
DATE_9/6/05_

1

4.     Defendant, The City of Worcester is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts, located in Worcester County. The Worcester Police Department ("WPD") was at all times relevant to this complaint a department of the City of Worcester.

5.     Defendant John J. Grady ("Grady") was at all times material to this complaint employed by the WPD and acting under color of state law. He is being sued in his individual capacity. He has a residential address located at 21 Aroostook Street, Worcester, Worcester County, Massachusetts.

6.     Defendant Michael Foley ("Foley") was at all times material to this complaint employed by the WPD and acting under color of state law. He had a business address of 9 – 11 Lincoln Street, Worcester, Worcester County, Massachusetts. He is being sued in his individual capacity.

7.     Defendant Paul Keyes ("Keyes") was at all times material to this complaint employed by the WPD and acting under color of state law. He is being sued in his individual capacity.

8.     Defendant Kevin V. Fifield ("Fifield") was at all times material to this complaint a law enforcement officer acting under color of state law. In addition he was employed by U.S. Security Associates, Inc., and/or Winn Management and was acting within the scope of his employment, and had a business address of 718 Main Street, Worcester, Worcester County, Massachusetts. At all times pertinent hereto Fifield was acting in conjunction with the police and within in the scope of his employment.

9.     Defendant US Security Associates, Inc. ("US Security") is a private foreign corporation doing business in Massachusetts but with a usual place of business abode located at 200 Manswell Court, Suite 500, Roswell, GA 30076.

10.    Defendant Winn Management Corporation ("Winn Management") is a domestic for profit real estate corporation with a usual place of business abode a 6 Faneuil Hall MarketPlace, Boston, Suffolk County, Massachusetts.

11.    At all times mentioned herein: Grady, Foley, Keyes, and Fifield, were acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

## FACTS

12.    On September 8, 2002, Herrera Betancourt was staying with his sister who was a tenant 718 Main Street, # 303, Worcester, Worcester County, Massachusetts a property owned by The Wellington Company, Inc. a domestic limited partnership with an address at 4 Faneuil Hall Loft area, Boston, Suffolk County, MA 02109, or by the Matheson Apartments, Inc., a domestic non profit with a usual place of business abode located at 6 Faneuil Hall Mkt. Boston, MA 02109.

13.    At all times material to this complaint the apartment complex and the common areas located at 718 Main Street, Worcester, Worcester County, Massachusetts (either owned by the Matheson Apartments, Inc., ("Matheson Apartments") or by The Wellington Company ("Wellington") were managed and controlled by defendant Winn Management Corporation on behalf of either Matheson Apartments or Wellington.

14.    At all times material to this complaint defendant US Security had entered a contract to provide police and security services at 718 Main Street, Worcester, Worcester County, Massachusetts with defendant Winn Management.

15.    On September 8, 2002, Herrera Betancourt went to the private parking lot located at 718 Main Street to listen to music on his sister's car.

16.    The parking area where Herrera Betancourt went to was under the control of defendants Winn Management and US Security.

17.    The car was parked improperly (i.e., straddling two designated parking spaces) and Herrera Betancourt backed the car in order to park it correctly within the designated parking boundaries.

18.    As he backed the vehicle Herrera Betancourt noticed various officers approaching him and trying to get his attention either by signaling to him and/or by saying, "Hey you."

19.    The defendant Grady, one of the aforesaid officers that Herrera Betancourt noticed, was working a private paid detail for Winn Management. Grady was wearing his WPD uniform, and badge and had his department issued gun, and he was exercising his powers as a Worcester Police officer.

20.    Defendant Fifield, another of the officers that Betancourt Herrera noticed, was working a private paid detail for Winn Management and/or US Security.  He was wearing a police uniform and badge and had a gun, and he was exercising his powers as a Police officer.

21.    Defendant Foley was one of the officers that police records reflect was present at the aforesaid time and place and he was working for the WPD and/or a detail for the Worcester Housing Authority. He was wearing his WPD uniform and badge and had a department issued gun, and he was exercising his powers as a Worcester Police officer.

22.    When Herrera Betancourt noticed the officers his attention shifted to them and the vehicle he was backing bumped into a vehicle behind him causing property damage onto his sister's vehicle only.

23.    Immediately after the impact Herrera Betancourt got out of the car to assess damage to the vehicles. Foley ran towards him with the two other officers and asked for identification.

3

24.    Herrera Betancourt provided one of the officers them with his identification and advised them that he was staying with his sister Fanny Herrera Betancourt at 718 Main Street Apt. 303, Worcester, Massachusetts.

25.    Defendant Fifield knew and had seen Herrera Betancourt at 718 Main Street before the incident.

26.    Fifield knew at the time of the incident that Herrera Betancourt was staying with his sister at 718 Main Street, Worcester, MA.

27.    Herrera Betancourt was not told he was under arrest nor told that he should not move the car.

28.    While the officers checked the information, Herrera Betancourt got back on the car and tried to move the car back into its proper parking spot.

29.    When Herrera Betancourt got back on the front of the car was facing towards Murray Avenue in Worcester, Massachusetts.

30.    As he did this two officers opened the driver's door and another officer opened the passenger door.

31.    Fifield entered the vehicle from one side and removed the keys from the ignition and Foley and Grady removed Herrera Betancourt from the vehicle through the driver's door.

32.    Foley and Grady dragged Herrera Betancourt out of the car they put his hands behind his back, applying excessive force to and twisting his arms and wrists, and then slammed him face down to the pavement.

33.    Immediately thereafter, as Herrera Betancourt lay unresisting on the ground and was helpless with his arms pinned behind his back, he was repeatedly and violently punched, kicked and stomped in his upper and mid back, forehead, face, nose, neck and shoulders.

34.    Foley then handcuffed Herrera Betancourt and while doing so deliberately twisted Herrera Betancourt's left thumb into an unnatural position, fracturing it and causing excruciating pain.

35.    After being handcuffed Herrera Betancourt lay prone with his face on the pavement.

36.    Defendant Foley then stepped on Herrera Betancourt's head with his boot and ground Herrera Betancourt's head into the pavement and subsequently when Herrera Betancourt tried to look up he was kicked in the head and forehead and told to "put you're fucking head down."

37.    Foley repeatedly pressed Herrera Betancourt's face into the pavement with his shod foot so as to injure and cause pain to the plaintiff.

4

38.     At some point in time after Herrera Betancourt was dragged out of the of the car and lay prone face down with his right cheek against the pavement, defendant Grady pulled his service revolver and pointed it directly at Herrera Betancourt's head.

39.     At the time that Grady aimed his revolver at Herrera Betancourt's head, the plaintiff had been fully restrained and handcuffed, was in custody, was not resisting or attempting to resist and posed no threat of injury to any person.

40.     Foley repeatedly referred to him as "fucking Spanish" and kept hitting him.

41.     Herrera Betancourt was hurt and was visibly bleeding from the face and ears.

42.     The WPD wagon arrived and Herrera Betancourt was placed in the wagon.

43.     Herrera Betancourt's sister was awakened by police and saw the plaintiff while inside the WPD wagon and awaiting transport.

44.     A WPD officer opened the doors of the wagon in the presence of the plaintiff's sister, and at that time she noticed her brother's face was covered in blood.

45.     At that time Betancourt Herrera heard his sister asking officers if they had hurt her brother.

46.     Betancourt Herrera heard officers respond by telling his sister that that they had not hurt Betancourt Herrera, but instead that he had "fallen."

47.     When the doors to the wagon were opened as aforesaid Herrera Betancourt noticed that his sister's car had been moved from the last position he saw it –the front facing Murray Avenue.

48.     Herrera Betancourt observed the front of the car facing the parking lot entrance on Wellington Street.

49.     The defendants Foley, Grady and Fifield, acting jointly and in concert, conspired and moved the car from its original terminal position (i.e., facing Murray Avenue) into such a position as to "sanitize" the scene of the incident and to support a false accusation that Herrera Betancourt had tried to run them over with the car as they approached from Wellington Street.

50.     Defendants individually and/or in concert moved the car approximately six (6) or eight (8) parking spaces in order to falsely and maliciously charge Herrera Betancourt with three counts of assault with a dangerous weapon.

51.     Defendants Grady, Foley and Fifield did not call an ambulance to bring medical assistance to Herrera Betancourt, who had visible injuries as a result of his encounter with them.

52.    Grady used a special police radio channel, not subject to tape recording on the WPD "turret tape" system, to contact his immediate supervisor, Lt. R. Krasinskas, who then came to the scene of the incident.

53.    After his arrest Betancourt Herrera Betancourt was transported to the WPD service division or lock up unit to be booked and processed on three counts of assault with a dangerous weapon.

54.    During the booking at the WPD, Herrera Betancourt was visibly injured in the booking room and bleeding from his face and ears.

55.    The booking officer at the WPD lockup unit, defendant Paul Keyes ("Keyes"), asked Herrera Betancourt: "How you'd receive those injuries?" "You're sick or injured?" "How that happened?"

56.    Herrera Betancourt in response to Keyes' question, "How that happen?" replied by pointing towards his side and saying: "This guy, you know."

57.    Immediately after that response Herrera Betancourt in further response to Keyes' questioning told Keyes: "Wow, my finger. See this?"

58.    Another officer in the booking room, Officer S. Pignataro, told Keyes Herrera Betancourt was injured.

59.    Keyes had a duty to insure that all injured prisoners in need of medical attention, including Herrera Betancourt, received prompt and appropriate medical attention.

60.    Neither Keyes nor any other officer of the WPD who came in contact with Herrera Betancourt made any effort to further investigate the cause of his injuries although they knew he was injured.

61.    Before taking Herrera Betancourt's mug shot, Defendant Keyes and another WPD officer in the booking room ordered Herrera Betancourt to wipe the blood from his face with a wet paper towel.

62.    Herrera Betancourt's appearance immediately after he cleaned the blood from his face at the police station, and his appearance shortly after treatment of his fractured thumb were as follows: *See* **Exhibit 1,** police mug shot and three photos taken on or about September 13, 2002.

63.    Herrera Betancourt complained about his injuries to Keyes and to another officer in the service division of the WPD and requested medical attention.

64.    Keyes was deliberately indifferent to Herrera Betancourt's medical needs and denied access to medical care until approximately four hours later.

6

65.  At the WPD, Herrera Betancourt was booked and charged with three counts of assault with a dangerous weapon.

66.  Herrera Betancourt was brought by the WPD personnel on September 8, 2002 to UMass Memorial Medical Center for treatment of his injuries.

67.  At the emergency room Herrera Betancourt alleged to the emergency room doctor he had been assaulted during his arrest (i.e., "police assaulted him," and "cops beat me up.").

68.  A CT scan done at UMass Memorial Medical Center showed a superficial soft tissue hematoma over the right frontal bone and beneath that in the frontal region there was a tiny adjacent subdural hematoma. i.e., bleeding inside of Herrera Betancourt's brain.

69.  Herrera Betancourt also complained of injuries to his pelvis, his lumbar and thoracic spine, and his knee, chest, patella, head, headaches, dizziness, nausea and vomiting.

70.  During the plaintiff's emergency room visit on September 8, 2002, UMass Memorial Medical Center physicians found a large 3 cm contusion above the right eyebrow, contusions to the right cheek, a 1 cm. laceration on the lip, contusions on the nose and multiple lines of excoriation in the left side of the neck.

71.  Herrera Betancourt returned to hospital days later because of continued complaints and was further diagnosed with a left thumb metacarpal base fracture which had to be surgically treated on September 18, 2002 with closed reduction, i.e., pinning and splinting the thumb and placing the hand and forearm in a cast.

72.  At all times material to this complaint Winn Management and/or U.S Security and/or Fifield owned, possessed, used or controlled a sophisticated video surveillance camera connected to a recording system. The camera was located at a property on Wellington Street on a building controlled by Winn Management, and the camera and video system provided recorded surveillance evidence, in whole or in part, of the September 8, 2002, incident from which this matter and the criminal charges against Herrera Betancourt arose.

73.  Counsel for the plaintiff requested that this videotape recorded evidence be preserved.

74.  Defendant Fifield had access to the aforesaid videotape recording.

75.  Upon information and belief the videotape possessed exculpatory evidence as to the criminal charges against Herrera Betancourt because it would have shown that that he was cooperative and never assaulted Grady, Foley or Fifield.

76.  Furthermore, the videotape would have conclusively shown that the three defendants assaulted Herrera Betancourt and "doctored" the scene of the incident by moving and re-positioning the vehicle in a suggestive manner in an effort to hide and justify their misconduct.

77. Immediately after Herrera Betancourt's arrest the video that would have shown portions of the parking lot where Herrera Betancourt encountered the officers were mysteriously erased from the videotape.

78. The tampering with the video occurred after the arrest.

79. The tape would have directly contradicted, Grady's, Foley and Fifield's version of events.

80. Defendants Fifield, Winn Management and/or US Security were responsible for preserving the videotape evidence but they failed to do so.

81. On or about May 8, 2003 Herrera Betancourt complained through his counsel to the WPD internal affairs unit about the conduct of the WPD officers that came in contact with him.

82. On May 20, 2003, Former Chief of Police James M. Gallagher advised plaintiff's counsel by letter that an investigation had begun into the allegations of Herrera Betancourt.

83. On August 25, 2003 Former Chief of Police James Gallagher advised in writing the Law department of the City of Worcester that they had not obtained any statements from percipient witnesses to the incident, including those of defendants Grady, Foley and Fifield, because pursuant to WPD policy: "A starting point of all complaint investigations, especially those filed by a third party, is for the Internal Affairs Division to request an interview with the complainant."

84. At all times material to this complaint the City of Worcester and the WPD had a policy of failing to conduct thorough and impartial investigations of citizen complaints of abuse at the hands of WPD officers.

85. On December 16, 2004, the criminal trial of Herrera Betancourt for three counts of assault with a dangerous was held in Worcester District Court and on that date Herrera Betancourt was found not guilty of all charges by a District Court judge.

86. At all times material to this complaint the City of Worcester had a policy and practice of not starting or completing internal affairs investigations brought by citizens against police officers until the conclusion of criminal charges.

87. At all times material to this complaint the City of Worcester had a policy and practice of not sanctioning or disciplining officers who were alleged to have abused citizens.

88. At all times material to this complaint the City of Worcester had a policy and practice of not sanctioning or disciplining officers who were found by state or federal court to have abused citizens.

89. On January 23, 2004, counsel for Herrera Betancourt was notified by Sgt. Michael Kwederis from the WPD internal affairs unit that the complaint had been re-assigned to him.

90.   On or about May 12, 2004, in a letter erroneously dated May 20, 2003, defendant Chief Vizzo notified counsel for Herrera Betancourt that the department had investigated the claim and the complaint "[was] unsustained, i.e. there is insufficient evidence to either prove or disprove its allegations."

91.   On that same day City Manager Michael R. O'Brien accepted and agreed with the finding made by Chief of Police Vizzo that there was insufficient evidence to either prove or disprove Herrera Betancourt's allegations.

92.   Neither Chief Vizzo nor City Manager O'Brien recommended any disciplinary action against Grady or Foley or against any other officer who came in contact with Herrera Betancourt.

93.   On September 2, 2004 counsel for the plaintiff gave notice and presentment under Massachusetts G.L. c. 258, the Massachusetts Torts Claims Act, of Herrera Betancourt's state law claims herein to the City Manager O'Brien by via certified mail, return receipt requested.

94.   Herrera Betancourt's notice and presentment letter put on notice City Manager O'Brien as Chief policy maker for the City of Worcester that the WPD had engaged in a pattern and practice of failing to "properly hire, retain, dismiss, supervise, discipline officers, or to train them in basic areas of law enforcement, thereby fostering a climate of impunity that encourage officers to abuse persons in their custody without the fear of repercussions."

95.   City Manager O'Brien was also provided with information of other citizen complaints against the WPD both in state and federal courts as well as evidence suggesting that numerous citizen complaints did not appear to have been investigated at all by the WPD internal affairs department.

96.   On September 3, 2004, City Manager O'Brien responded to the plaintiff's notice and presentment letter advising he had copied the letter to the City of Worcester Law Department and that a representative of the Law Department would be in contact with Herrera Betancourt's counsel.

97.   As of the date of this Complaint, neither the City of Worcester Law Department nor any other representative of the City have contacted plaintiff's counsel regarding this matter, and there has been no settlement or offer of settlement made in connection with the state law claims herein.

98.   City Manager O'Brien acting on behalf of defendant City of Worcester was indifferent to the allegations made by the plaintiff in his letter of notice and presentment and did not reopen an investigation into the allegations and complaint of Herrera Betancourt.

## Damages

99.    The plaintiff was subjected to violence and excessive force by defendants Grady, Foley and Fifield, and they thereby caused him to sustain injuries to his brain, face, mouth, thumb and other parts of his body.

100.    Grady, Foley and Fifield each used excessive force, and each countenanced and deliberately failed to restrain the use of excessive force by the other two, and thereby they individually and collectively caused pain and physical injury to Herrera Betancourt as alleged herein.

101.    As a result of the injuries he sustained as alleged herein Herrera Betancourt incurred reasonable and necessary medical expenses in the amount of $11,662.44.

102.    As a result of the incident, plaintiff endured physical pain and suffering as well as humiliation and embarrassment during and after the incident.

## COUNT I: 42 U.S.C. § 1983, FOURTH & FOURTEENTH AMENDMENTS
### Grady, Foley, Fifield

103.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

104.    Defendants Grady, Foley, Fifield, acting jointly used unreasonable and unnecessary force on Herrera Betancourt and seized him without probable cause.

105.    By the same actions described above, the defendants Grady, Foley and Fifield deprived Herrera Betancourt of clearly established and well settled rights under the Constitution of the United States including the rights under the Fourth and Fourteenth Amendments.

106.    The defendants acted with reckless disregard for the plaintiffs' constitutional rights.

107.    The defendants acted recklessly and maliciously by conspiring and doctoring official reports to cover their misconduct.

108.    The defendants acted with reckless and/or malicious disregard Herrera Betancourt's need for medical attention.

109.    As a direct and proximate result of the conduct, Herrera Betancourt suffered the injuries described above.

## COUNT II: 42 U.S.C. § 1983 FOURTH AMENDMENT & FOURTEENTH AMENDMENTS
### Keyes

110.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

111.  Defendant Keyes was deliberately indifferent to Herrera Betancourt's need for medical attention notwithstanding that the plaintiff gave prompt notice of his injuries to Keyes upon arriving at the WPD service division and notwithstanding that the plaintiff had obviously sustained blunt force trauma to the head as well as other parts of this body.

112.  By the same actions described above, Keyes deprived Herrera Betancourt of clearly established and well settled rights under the Constitution of the United States including the rights under the Fourth and Fourteenth Amendments.

113.  The defendant Keyes acted with reckless disregard for the plaintiff's constitutional rights.

114.  The defendant acted with reckless disregard to Herrera Betancourt's need for medical attention.

115.  As a direct and proximate result of the conduct, Herrera Betancourt endured needless pain and suffering.

### COUNT III: MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 112 § 11IM
### Grady, Foley, Fifield

116.  The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

117.  Defendants Grady, Foley and Fifield, individually and jointly, deprived Herrera Betancourt of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

118.  As a direct and proximate result of the aforesaid unlawful conduct, Herrera Betancourt suffered the injuries described herein.

### COUNT IV: ASSAULT AND BATTERY
### Grady, Foley, Fifield

119.  The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

120.  Defendants Grady, Foley and Fifield committed the common law torts of assault and battery against the plaintiff, Betancourt Herrera.

121.  As a direct and proximate result thereof, Betancourt Herrera suffered the injuries as described herein.

## COUNT V: FALSE IMPRISONMENT
### Grady, Foley, Fifield

122.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

123.    Defendants Grady, Foley and Fifield arrested Betancourt Herrera without probable cause and caused his confinement.

124.    Defendants Grady and Foley and Fifield committed the tort of false imprisonment.

125.    Defendants Grady, Foley and Fifield did not have probable cause to arrest Herrera Betancourt.

126.    As a direct and proximate result, Herrera Betancourt suffered the injuries as described above and was unlawfully deprived of his liberty.

## COUNT VI: MALICIOUS PROSECUTION
### Grady, Foley, Fifield

127.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

128.    Defendants Grady and Foley and Fifield caused criminal proceedings to be instituted against Herrera Betancourt without probable cause and with malice as defined in state tort law.

129.    As a direct and proximate result of this conduct, Herrera Betancourt was subjected to malicious prosecution, coercion and intimidation and incurred legal expenses for his defense.

## COUNT VII: 42 U.S.C. § 1983, FOURTH AND FOURTHEENTH AMENDMENTS
### City of Worcester

130.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

131.    The City maintained a policy and/or custom of deliberate indifference to proper supervision, training, discipline and retention of police officers and a policy and/or custom of deliberate indifference to the safety of citizens and persons in custody of the WPD in failing to discipline its officers for the excessive use of force. As a result of this policy or custom, police officers in the City of Worcester, including the named individual defendants herein, knew that the use of unnecessary violence and excessive use of force would likely go unnoticed and/or unpunished.

132.    The City acted with deliberate indifference to the constitutional rights of citizens and other persons, including the plaintiff, by failing to take adequate steps to supervise and train its officers and to deter them from the use of excessive force.

133.    The City acted with deliberate indifference to the constitutional rights of persons in custody of the WPD as a result of deliberate indifference to the medical needs of prisoners, including the plaintiff.

134.    The City acted with deliberate indifference to the constitutional rights of persons injured due to misconduct of WPD officers by failing to adequately investigate complaints of excessive force filed with the WPD internal affairs division.

135.    The policies and customs of the City of Worcester were the moving force behind the acts of the individually named police defendants and were the cause of the plaintiff's injuries.

## COUNT VIII: M.G.L. 12, § 11I
### Winn Management and Officers

136.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

137.    On September 8, 2002, defendant Winn Management was doing business with and/or was the agent or servant of Matheson's Apartments and/or the Wellington Company, and employed defendant Grady, an off duty WPD officer, and/or defendant Fifield another police officer, for a private security detail at 714 Main Street, Worcester.

138.    On September 8, 2002, defendant Grady was wearing a WPD uniform and badge, and he was armed with his WPD issued gun.

139.    Winn Management paid for defendant Grady's services at the aforesaid time and place.

140.    Winn Management hired defendant Grady, an instrument of the Commonwealth's power, as a detail officer to serve its business interest at 714 Main Street, Worcester, MA.

141.    Defendant Grady worked under the supervision of Winn Management at 714 Main Street, Worcester, MA on September 8, 2002.

142.    Defendant Grady was working as an employee, agent or servant of Winn Management on the premises it managed for its private purpose. He was under the command of a superior officer.

143.    Defendant Grady was acting within the scope of his employment as a detail officer for Winn Management at 714 Main Street, Worcester, MA, and was implicitly authorized by Winn Management to use force in appropriate situations at all times pertinent to this complaint.

144.    Grady's conduct deprived Herrera Betancourt of his rights under federal and state law by threats, intimidation, coercion, assault and battery, and false imprisonment, thereby violating the Massachusetts Civil Rights Act.

145.    As a private employer, Winn Management is vicariously liable for the acts of its agent, defendant Grady.

146.   As a direct and proximate result of this conduct, Herrera Betancourt suffered the injuries described above.

147.   On September 8, 2002, defendant Fifield was wearing a police uniform and badge, and he was armed with a gun.

148.   Winn Management paid for defendant Fifield's services at the aforesaid time and place.

149.   Winn Management hired defendant Fifield, an instrument of the state's power, as a detail officer to serve its business interest at 714 Main Street, Worcester, MA.

150.   Defendant Fifield worked under the supervision of Winn Management at 714 Main Street, Worcester, MA on September 8, 2002 and at all times pertinent hereto acted as Winn Managements agent, servant or employee.

151.   Defendant Fifield was working as an employee of Winn Management on the premises it managed for its private purpose. He was under the command of a superior officer.

152.   Defendant Fifield was acting within the scope of his employment as a detail officer for Winn Management at 714 Main Street, Worcester, MA, and was implicitly authorized by the principal to use force in appropriate situations at all times alleged in this complaint.

153.   Defendant Fifield's conduct deprived Herrera Betancourt of his rights under federal and state law by threats, intimidation, coercion, assault and battery, and false imprisonment, thereby violating the Massachusetts Civil Rights Act.

154.   As a private employer, Winn Management is vicariously liable for the acts of its agent, defendant Fifield.

155.   As a direct and proximate result of this conduct, Herrera Betancourt suffered the injuries described herein.

## COUNT IX 42: U.S.C. § 1983, FOURTH AND FOURTEENTH AMENDMENTS
### U.S. Security Associates and Officers

156.   The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

157.   By the actions described above the defendant U.S. Security Associates and its officers, acting under color of law and in conjunction with the other defendant police officers, deprived the plaintiff of his right to be free from excessive force and unlawful arrest, all in violation of 42 U.S.C. §§ 1983, 1988.

## COUNT X: M.G.L. 12, § 11I
### U.S. Security Associates and Officers

158.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

159.    On September 8, 2002, defendant US Security was doing business with Winn Management and employed defendant Fifield a police officer, for a private security detail at 714 Main Street, Worcester.

160.    On September 8, 2002, defendant Fifield was wearing a police uniform and badge, and he was armed with a gun.

161.    US Security in whole, in part or in combination with Winn Management paid for defendant Fifield's time.

162.    US Security in whole in part or in combination with Winn Management hired defendant Fifield, an instrument of the state's power, as a detail officer to serve its business interest at 714 Main Street, Worcester, MA.

163.    Defendant Fifield worked under the supervision of US Security and/or Winn Management at 714 Main Street, Worcester, MA on September 8, 2002.

164.    Defendant Fifield was working as an employee of US Security and/or Winn Management on the premises it managed for its private purpose. He was under the command of a superior officer.

165.    Defendant Fifield was acting within the scope of his employment as a detail officer for US Security and/or Winn Management at 714 Main Street, Worcester, MA, and was implicitly authorized by the principal to use force in appropriate situations at all times alleged in this complaint.

166.    Defendant Fifield's conduct deprived Herrera Betancourt of his rights under federal and state law by threats, intimidation, and coercion thereby violating the Massachusetts Civil Rights Act.

167.    As a private employer, US Security and/or Winn Management is/are vicariously liable for the acts of its agent, defendant Fifield.

168.    As a direct and proximate result of this conduct, Herrera Betancourt suffered the injuries described above.

## COUNT XI: NEGLIGENCE
### Winn Management and Officers

169.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

15

170.    Defendants Grady and Fifield were acting within the scope of their employment as detail officers at 714 Main Street, Worcester, Massachusetts.

171.    Defendants Grady and Fifield were acting as "borrowed servants" of the defendant Winn Management.

172.    Defendants Grady and Fifield were doing business within the scope of their employment at Winn Management.

173.    Defendants Grady and Fifield negligently used force on Herrera Betancourt.

174.    Employees of Winn Management were negligent in (1) failing to properly and adequately supervise defendants Grady and Fifield; and (2) failing to properly train and instruct police officers it hired, such as defendants Grady and Fifield, on how to deal with customers or people it came in contact with at the properties it managed.

175.    As a proximate cause of this negligence, Herrera Betancourt suffered damages as described above.

## COUNT XII: NEGLIGENCE
### U.S. Security Associates and Officers

176.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

177.    Defendant Fifield was acting within the scope of their employment as detail officers at 714 Main Street, Worcester, Massachusetts.

178.    Defendant Fifield was acting as "borrowed servants" of the defendant US Security in whole or in combination with Winn Management.

179.    Defendant Fifield was doing business within the scope of his employment at US Security in whole or in combination with Winn Management.

180.    Defendant Fifield negligently used force on Herrera Betancourt.

181.    Employees of US Security in whole or in combination with Winn Management were negligent in (1) failing to properly and adequately supervise defendant Fifield; and (2) failing to properly train and instruct police officers it hired, such as defendant Fifield, on how to deal with customers or people it came in contact with at the properties it managed.

182.    As a proximate cause of this negligence, Herrera Betancourt suffered damages as described above.

## COUNT XIII: NEGLIGENCE
### City of Worcester

183.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

184.    As stated previously, on or about September 2, 2004 counsel for the plaintiff gave notice and presentment under Massachusetts G.L. c. 258, the Massachusetts Torts Claims Act, via certified mail return receipt requested to the City Manager O'Brien and the Law Department. *See* **Exhibit 2.**

185.    Plaintiff properly performed the conditions precedent to filing an action under M.G.L. c. 258.

186.    Defendants Grady, Foley, and Keyes were acting within the scope of their employment at all times material to this complaint.

187.    The conduct of the defendants Grady, Foley and Keyes amount to negligence.

188.    Employees of the City of Worcester were negligent in failing to: 1) properly and adequately supervise defendants Grady, Foley and Keyes; (2) protect the plaintiff of the use of force by defendants Grady, Foley and Keyes; (3) properly to train and instruct defendants Grady, Foley and Keyes in the use of force, and (5) properly investigate and discipline police officers thereby permitting an encouraging acts of misconduct and impunity against civilians.

189.    As a direct and proximate result of the negligence, Betancourt Herrera suffered damages as described above.

## COUNT XIV: SPOLIATION OF EVIDENCE
### Fifield, Winn Management, U.S. Security Associates

190.    The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein

191.    By the actions described above the defendants, Fifield, Winn Management and/or US Security, individually, or jointly destroyed or tampered with a surveillance videotape that upon information and belief contained exculpatory evidence as to the criminal charges against the plaintiff, and thereby prejudiced him and forced him to incur unnecessary expense for his defense.

192.    By their actions as described above the defendants named herein did wrongfully deprive the plaintiff of evidence that would otherwise be available to him to meet his burdens of proof in this action.

17

WHEREFORE, Betancourt Herrera requests that this Honorable Court:

1. Award compensatory damages;
2. Award punitive damages against all defendant police officers;
3. Award the costs of this action, including reasonable attorney fees, to the plaintiff;
4. Award such other and further relief as this court may deem necessary and appropriate including imposing sanctions for spoliation of evidence.

Respectfully submitted,
Plaintiff by his attorneys,

Hector E. Pineiro, Esquire, BBO # 555315
Robert A. Scott, Esquire, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
Telefax. (508) 770-1300
h.pineiro@att.net

DATED: September 6, 2005

18

℈JS 44    (Rev. 11/04)

# CIVIL COVER SHEET

**05 - 40154 FDS**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS

Jose Herrera Betancourt

**DEFENDANTS** John J. Grady, Michael Foley, Paul Keyes, City of Worcester, Kevin Fiefield, U.S. Security Assoc., Inc. Waste Management, Inc.

(b)   County of Residence of First Listed Plaintiff   Windham, Conn.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Worcester
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)   Attorney's (Firm Name, Address, and Telephone Number)
Hector E. Pineiro, 807 Main St. Worcester, MA  (508) 770-0600

Attorneys (If Known)

## II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ❑ 1   U.S. Government Plaintiff | ☒ 3   Federal Question (U.S. Government Not a Party) |
| ❑ 2   U.S. Government Defendant | ❑ 4   Diversity (Indicate Citizenship of Parties in Item III) |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ☒ 2 | ❑ 2 | Incorporated and Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 610 Agriculture | ❑ 422 Appeal 28 USC 158 | ❑ 400 State Reapportionment |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 362 Personal Injury - Med. Malpractice | ❑ 620 Other Food & Drug | ❑ 423 Withdrawal 28 USC 157 | ❑ 410 Antitrust |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 365 Personal Injury - Product Liability | ❑ 625 Drug Related Seizure of Property 21 USC 881 | | ❑ 430 Banks and Banking |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | ❑ 368 Asbestos Personal Injury Product Liability | ❑ 630 Liquor Laws | **PROPERTY RIGHTS** | ❑ 450 Commerce |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' Liability | | ❑ 640 R.R. & Truck | ❑ 820 Copyrights | ❑ 460 Deportation |
| ❑ 151 Medicare Act | ❑ 340 Marine | **PERSONAL PROPERTY** | ❑ 650 Airline Regs. | ❑ 830 Patent | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❑ 345 Marine Product Liability | ❑ 370 Other Fraud | ❑ 660 Occupational Safety/Health | ❑ 840 Trademark | ❑ 480 Consumer Credit |
| | | ❑ 371 Truth in Lending | ❑ 690 Other | | ❑ 490 Cable/Sat TV |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | ❑ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ❑ 810 Selective Service |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 385 Property Damage Product Liability | ❑ 710 Fair Labor Standards Act | ❑ 861 HIA (1395ff) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 190 Other Contract | ❑ 360 Other Personal Injury | | ❑ 720 Labor/Mgmt. Relations | ❑ 862 Black Lung (923) | ❑ 875 Customer Challenge 12 USC 3410 |
| ❑ 195 Contract Product Liability | | | ❑ 730 Labor/Mgmt.Reporting & Disclosure Act | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| ❑ 196 Franchise | | | ❑ 740 Railway Labor Act | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ❑ 865 RSI (405(g)) | ❑ 892 Economic Stabilization Act |
| ❑ 210 Land Condemnation | ❑ 441 Voting | ❑ 510 Motions to Vacate Sentence | ❑ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❑ 893 Environmental Matters |
| ❑ 220 Foreclosure | ❑ 442 Employment | **Habeas Corpus:** | ❑ 791 Empl. Ret. Inc. Security Act | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 894 Energy Allocation Act |
| ❑ 230 Rent Lease & Ejectment | ❑ 443 Housing/ Accommodations | ❑ 530 General | | ❑ 871 IRS—Third Party 26 USC 7609 | ❑ 895 Freedom of Information Act |
| ❑ 240 Torts to Land | ❑ 444 Welfare | ❑ 535 Death Penalty | | | ❑ 900Appeal of Fee Determination Under Equal Access to Justice |
| ❑ 245 Tort Product Liability | ❑ 445 Amer. w/Disabilities - Employment | ❑ 540 Mandamus & Other | | | |
| ❑ 290 All Other Real Property | ❑ 446 Amer. w/Disabilities - Other | ❑ 550 Civil Rights | | | ❑ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ❑ 555 Prison Condition | | | |

## V.  ORIGIN   (Place an "X" in One Box Only)

| | | | | | | | Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|---|
| ☒ 1   Original Proceeding | ❑ 2   Removed from State Court | ❑ 3   Remanded from Appellate Court | ❑ 4   Reinstated or Reopened | ❑ 5   Transferred from another district (specify) | ❑ 6   Multidistrict Litigation | ❑ 7 | |

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC ss. 1983

Brief description of cause: Excessive force in arrest, beaten in custody

## VII.  REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** To be determined

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ❑ No

## VIII.  RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  9/6/05

SIGNATURE OF ATTORNEY OF RECORD   _[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**05-40154 FDS**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. **Title of case (name of first party on each side only)** Jose Herrera Betancourt v. John J. Grady et al.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).**

- [ ] **I.** 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

- [x] **II.** 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.  *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

- [ ] **III.** 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

- [ ] **IV.** 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

- [ ] **V.** 150, 152, 153.

3. **Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

None

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

YES [ ]    NO [x]

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)**

YES [ ]    NO [x]

**If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

YES [ ]    NO [ ]

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

YES [ ]    NO [x]

7. **Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**

YES [x]    NO [ ]

   A.  **If yes, in which division do all of the non-governmental parties reside?**

   Eastern Division [ ]    Central Division [x]    Western Division [ ]

   B.  **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

   Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)**    n/a

YES [ ]    NO [ ]

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME** Hector E. Pineiro

**ADDRESS** 807 Main Street, Worcester, MA 01610

**TELEPHONE NO.** (508) 770-0600

(CategoryForm.wpd - 5/2/05)

# EXHIBIT 1









# EXHIBIT 2

# HÉCTOR E. PIÑEIRO

ATTORNEY AT LAW

HECTOR E. PIÑEIRO

ROBERT H. BEADEL**
**ALSO ADMITTED IN CA. NY

ROBERT A. SCOTT

800 MAIN STREET
WORCESTER, MASSACHUSETTS 01610
(508) 770-0600
(617) 720-4008

FAX (508) 770-1300
Email: h.pineiro@verizon.net

CLAIMS ADMINISTRATOR
HAROLD CRUZ

CORRESPONDENT
MARÍA S. PIÑEIRO SOLER, L.L.M.
ATTORNEY AT LAW
POPULAR CENTER BUILDING
18TH FLOOR - SUITE 1818
209 MUÑOZ RIVERA AVE.
SAN JUAN, PUERTO RICO 00918
TEL: (787) 250-8304
FAX (787) 758-4236

September 2, 2004

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED
RECEIPT NO. 7003 0500 0003 9760 8996

The Honorable Michael R. O'Brien
City Manager, City of Worcester
City Hall
455 Main Street
Worcester, MA 01608

RE:    **NOTICE AND PRESENTMENT OF A CIVIL CLAIM,
MASSACHUSETTS MUNICIPAL TORT CLAIMS ACT, M.G.L. c 258 s. 4
FEDERAL CIVIL RIGHTS STATUTE 42 U.S.C. § 1983**

Claimant: Jose H. Betancourt
Date of Injury: September 8, 2002

Dear Mr. O'Brien:

I write to give you notice and presentment for Jose Herrera Betancourt of a claim for damages that he has against the City. This claim arises from misfeasance and/or misconduct by members of the Worcester Police Department, who perpetrated and/or countenanced the assault, battery, injury, false arrest, and arrest with excessive force, of Mr. Betancourt on September 8, 2002, and who perpetrated and/or countenanced the beating and physical abuse of Mr. Betancourt while in their custody on that date. The acts and omissions complained of were negligent and/or reckless. They directly caused severe personal injuries, pain and suffering to Mr. Betancourt, and caused him to undergo extensive medical treatment and to incur costs of the same as well as costs for his defense against felony criminal charges made against him without probable cause. As I am sure you know, Article III Section 3-1 of the Worcester City Charter designates the city manager as "chief administrative and executive officer of the city responsible for all city agencies whether established before adoption of this charter or thereafter, except that of the City clerk, city auditor, citizen complaints officer, or any official appointed by the governor or by any body elected by the voters of the city." I submit this claim to you as chief executive officer of the City, pursuant to M.G.L. c. 258 § 4.

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 2

This letter is also submitted to you as the city's administrative policymaker, and to the Mayor and City Council as the legislative policymaking body, to advise that the City is also liable pursuant to federal law, 42 U.S.C. § 1983, for the deliberate violation of Mr. Becancourt's civil rights by police officers who battered him and who falsely and maliciously charged him with criminal offenses. These violations of Mr. Betancourt's rights resulted from a longstanding failure of supervision and oversight of the Police Department by the City Manager. This failure demonstrates deliberate indifference on the part of the City to the rights of Mr. Betancourt and others, which fostered and perpetuated an understanding within the ranks of the Police Department that gratuitous, violent abuse of persons by officers would not result in discipline and, indeed, may be done with virtual impunity. The support provided below for these assertions is detailed and lengthy, proportionate to the seriousness of the problem to which I would most respectfully call your attention. It is a problem the City can no longer ignore.

## FACTS

Shortly after midnight on the morning of September 8, 2002, Mr. Betancourt approached a motor vehicle belonging to his sister and to which he had access, which was parked in a private parking lot of Wellington Apartments at Wellington Street and Murray Avenue, Worcester. Mr. Betancourt entered the vehicle intending to listen to music on the vehicle's CD player. The car was parked improperly. He started the car and backed it in order to park it correctly within the boundary lines designating the parking space. The driver's side window was open about two inches, and recorded music was playing at mid to high volume. As he backed the car Mr. Betancourt noticed at least two police officers approaching the area he was in, and he believes one of these men made some effort to get his attention either by calling or signaling to him. His attention shifted to the officers as the car was in motion, and the rear bumper of the car made contact with the front bumper of another vehicle that was directly behind Mr. Betancourt. When he bumped into the vehicle behind him Mr. Betancourt immediately moved the car he was in forward and stopped the car immediately in the middle of the Wellington Apartments parking lot. He got out of the vehicle of his own volition. The officers asked him for identification and he gave his identification to one of the officers. He had not been told up to this point in time that he was under arrest, or that he should not move the vehicle, or anything of that kind. One of the officers that worked a detail for the Wellington Apartments (Officer Kevin Fifield) knew Mr. Betancourt.

Mr. Betancourt got back behind the wheel of the car and tried to move it back into its parking spot. Then, in a matter of seconds, he saw officers entering the car from the driver's and passenger's sides. Mr. Betancourt recalls two officers opening the driver's door and another coming through the passenger door. The officer who came in from the passenger side took the car keys from the ignition and the two other officers dragged Mr. Betancourt out of the car, punching him repeatedly, and slammed him into the pavement. Mr. Betancourt was then kicked and stomped in the head and body. An officer stepped on his head and forced it into the pavement. One officer (Sgt. Grady) used deadly force by drawing his service weapon and aiming it at Mr. Betancourt's head while Mr. Betancourt lay prone face down with his right cheek to the

pavement.   He was bleeding from the face and ear.  He had facial abrasions from the pavement.
An officer repeatedly referred to him as "fucking Spanish" and kept on hitting him.  Mr.
Betancourt was under total restraint, could not resist and did not attempt to resist.  A number of
other officers arrived.  If Mr. Betancourt tried to look around one of them would say to him, "Put
your fucking head down."  Mr. Betancourt was transported in a police wagon.  At one time while
he was inside the wagon Mr. Betancourt saw the door to the wagon open and saw his sister in the
company of officers and heard her ask the officers if they had hurt him.  He heard an officer say to
her that Mr. Betancourt had fallen, which he categorically denies.  A copy Mr. Betancourt's
complaint to the Internal Affairs division is enclosed. (Exhibit  1)  It was mailed to your Police
Department on approximately April 30, 2003.  I also enclose copies of his booking photograph
with some other photographs taken shortly after the incident (Exhibit 2)

     The officers claimed falsely that Mr. Betancourt had tried to run them down with the car
as they entered the parking lot, and they charged him with three counts of assault with a deadly
weapon.  The incident and arrest reports are attached. (Exhibit 3)  An eyewitness later testified
that the vehicle was not facing in the direction the officers approached from, and it was not in the
area where the officers claimed Mr. Betancourt had used it to assault them.  This witness also
corroborated Mr. Betancourt's account of the beating.  After his arrest Mr. Betancourt was
transported to the police station in the wagon and taken to the booking room.  He observed
surveillance cameras there and noticed that the shift commander or other officer in charge of the
booking area did not allow other officers to book him.  The booking officer asked Mr. Betancourt
what had happened to him, (as he is required to do under the Massachusetts Injured Prisoner law)
and Mr. Betancourt recalls telling him that the officers who arrested him had assaulted him.  In
the videotape he is observed telling the booking person "it was that guy" or words to that effect.
He was taken in custody to UMass Memorial Hospital at approximately 3:30 a.m., and
subsequently transferred to UMass Medical Center for trauma evaluation.  Medical records show
that he suffered numerous soft tissue injuries, including a hematoma over the right frontal area of
the skull and, beneath this, a small subdural (beneath the skull) hematoma (bleeding) in the brain.
There was also a fracture of the left thumb, which was treated surgically.  The officers' story that
he "fell" to the pavement from the driver's seat of the vehicle is not consistent with the
distribution and severity of injuries to the face, head, hand, neck, legs, and back. Copies of
portions of the medical record are attached.  (Exhibit 4)

     During the booking process there was no question that the subject had fresh injuries.  The
booking officer asked Mr. Betancourt what had happened, and before Mr. Betancourt was
photographed an officer gave him a paper towel with instruction to wipe blood from his face.
Despite the patent signs of injury observable to the person in charge of booking (See Exhibit 2),
no one at the Worcester Police Department initiated an investigation.  The department's lack of
interest in ascertaining the cause of injury is evidenced by the department's conduct in the
immediate aftermath of the incident and after the victim formally requested an investigation. A
supervisor is required to begin, *sua sponte*, an investigation into the circumstances of an event of
this nature because of the plainly apparent injuries and the use of deadly force.  The first thing that
Sgt Grady did after the beating stopped was to call a supervisor to the scene – despite the fact

that Mr. Betancourt had obviously sustained blunt force trauma to the head. At a minimum Sgt. Grady should have filed a "use of force report" pursuant to WPD policies and procedures. But Sgt. Grady did not and the supervisor who was called to the scene, Lt. R. Krasinskas, did not require him to do so. Lieutenant Krasinskas is also liable for civil rights violations on grounds of "supervisory liability" for failing to properly train and/or supervise his subordinate. Sergeant Grady testified at trial that he did not have to submit a use of force report on account of the weapon because he "did not fire."

Mr. Betancourt's detailed written complaint, describing how he was arrested with excessive force and how he was beaten while restrained and in custody, was received at the Internal Affairs Division on May 15, 2003. Photographs and Medical records were enclosed with the complaint describing his injuries in detail, and Mr. Betancourt also signed a medical release to allow IAD direct access to his medical records. On May 20, 2003, Police Chief James M. Gallagher responded by letter to this office, stating "An investigation into the allegation(s) that are contained in your complaint has begun." Mr. Betancourt declined to be interviewed by officers of IAD as he had provided a statement to them with extensive detail and records. At no time did IAD advise or suggest that the investigation of his complaint was contingent on Mr. Betancourt submitting to an interview with colleagues of officers who battered him and/or countenanced the battery. A professional Internal Affairs Department is responsible to investigate regardless of whether the complainant submits to an interview. Yet, on August 25, 2003, after Mr. Betancourt sought access to the IAD file on his complaint to prepare his defense against criminal charges arising from this incident, Chief Gallagher revealed for the first time in a letter to the city Law Department, that such a contingency did exist, and that therefore there was nothing in the investigation file but Mr. Betancourt's complaint and correspondence with this office. The department had sat on the complaint of Mr. Betancourt for more than three (3) months. Federal cases have held that failure to investigate incidents of misconduct promptly can be the basis for liability under the federal civil rights statutes.

On December 16, 2003, Mr. Betancourt was found not guilty of the charges brought against him in this incident, three counts of assault with a deadly weapon. Later the Police Department appeared to reverse its no-inteview-no investigation policy. Sergeant Michael J. Kwederis of IAD wrote to this office on January 23, 2004, advising that the complaint "is currently under investigation" and again requesting an interview with Mr. Betancourt. By letter of February 27, 2004, this office advised that Mr. Betancourt would not submit to an interview. He had been examined in great detail under oath at his trial of December 16, 2003, and it appeared that IAD personnel witnessed this examination. To assure that this examination would be available to IAD, my office also advised in the letter of February 27, 2004, that we had audio tapes of the trial and would share them with IAD on request. There was no response to this offer. On May 20, 2004, IAD wrote this office advising that the investigation and been concluded and that the complaint had not been sustained. In all probability the IAD did not obtain tapes or transcript of the trial.

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 5

## MEDICAL EXPENSES

Mr. Betancourt's treatment expenses documented to date are as follows:

| | |
|---|---|
| 9/8/02 – 9/18/02 physician services | $ 2,954.00 |
| 9/8/02 hospital services (laboratory, imaging, ER) | 5,129.00 |
| 9/11/02 – 9/12/02 hospital services (pharmacy, imaging, ER, cast) | 1,971.16 |
| 9/16/02 hospital services (imaging, clinic) | 184.00 |
| 9/18/02 hospital services (pharmacy, supplies, OR, anesthesia) | 1,424.28 |
| | |
| Total expenses for treatment through 9/18/02 | $11,662.44 |

Copies of these medical bills are attached. (Exhibit 5)

## DEMAND PURSUANT TO M.G.L. c 258 s. 4

The City is liable to Mr. Betancourt for damages caused by the negligent and/or reckless acts of its uniformed officers in this incident, and he accordingly makes demand for payment of damages to the limit provided under state law: $100,000. In doing so he does not waive his right to recover in tort action against any other party for whom one or more of the officers involved was acting as employee or agent at the time of the incident. According to the law, Mr. Betancourt will allow six months from your receipt of this notice for possible settlement of this claim before filing a civil action on account of the state law negligence/recklessness claim. He reserves the right to file suit at any time to vindicate his civil rights.

## CIVIL RIGHTS VIOLATIONS

In presenting this written notice of his claim for damages due to negligence and/or recklessness under the Municipal Tort Claims Act, M.G.L c. 258, Mr. Betancourt does not waive any claim or remedy that he has under the laws of the United States. In particular he does not waive any claim that is actionable under 42 U.S.C. § 1983 for violations of his civil rights by Worcester police officers acting under color of law when they battered him during and after his arrest, used unreasonable force to subdue him, falsely and maliciously charged and prosecuted him, and when one or more officers did not interfere with or stop violations of his rights by one or more officers. The Worcester police officers who injured and falsely arrested Mr. Betancourt, and officers who aided or countenanced such misconduct, acted under color of law. By performing their duties in such a way as to violate Mr. Betancourt's constitutional rights, they became liable for damages. Mr. Betancourt's damages include costs of medical care, pain and suffering, emotional distress, temporary and permanent disability, punitive damages and claims for court costs, other expenses and attorney fees for criminal defense and (if this matter is not resolved) for litigation. Liability rests also on police supervisors for failures of training, supervision and/or discipline amounting to deliberate indifference to the rights of persons within the City, and it rests with the City itself for policy or pattern of practice evincing deliberate indifference.

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 6

<u>The Worcester Police Department has engaged in a pattern and practice of failing to properly hire,
retain, dismiss, supervise and discipline officers, or to train them in basic areas of law
enforcement, thereby fostering a climate of impunity that encourages officers to abuse persons in
their custody without fear of repercussions.</u>

The United States First Circuit Court of Appeals has held that municipalities as well as
individual police officers may be held liable under section 1983 where deficiencies in supervision
or training cause violations of civil rights. To prove supervisory liability "[I]t must be shown that
the supervisor's conduct or inaction amounted to a reckless or callous indifference to the
constitutional rights of others." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir.
1989). The supervisory conduct must constitute "gross negligence amounting to deliberate
indifference" and there must be an affirmative link between street level misconduct and the action
or inaction of supervisory officials. *Id.* Supervisors and municipalities are also responsible when
a plaintiff establishes a pattern of rights violations being condoned or ignored by policy makers.
"A pattern of past abuses or official condonation thereof is . . . required when a plaintiff has sued
a municipality." *Id.* at 567.

The City of Worcester is no stranger to cases of police misconduct that go beyond the
scope of wrongdoing by individual officers. The United States 1st Circuit Court of Appeals has
found the City liable on the basis of supervisory and training failures for violation of civil rights of
its citizens. On May 14, 1986, this court ruled that a jury could "properly find that the City of
Worcester was grossly negligent in its training of police officers and that the negligence was the
proximate cause of the plaintiff's injuries." *Wierstack v. Heffernan*, 789 F.2d 968, 975 (1st Cir.
1986). This case involved a person who was pistol wiped by then Patrolman Heffernan . The
appeals court held, "we find the evidence to go well beyond the close case. . . .There was
evidence that the City failed to instruct its officers in the proper amount of force that should be
used in making an arrest and the need to inspect injured prisoners as required by Massachusetts
injured prisoner statute." *Id.* at 974-975. A copy of the court's opinion is enclosed as Exhibit 6.
I hope you will find the court's reasoning instructive: "Indeed, the Chief of Police blatantly
admitted that he would not have wanted Officer Heffernan to have included in his arrest report the
fact he had struck the plaintiff three or four times." *Id.*

It appears to me that the City never harkened to the instruction of the appeals court in
*Wierstack.* Officer Heffernan was promoted from patrolman to detective. What did the City
Manager, the Honorable Jeffrey Mulford, or the Acting Chief of Police, Thomas L. Leahy, do in
reaction to the Wierstack decision? Nada. In a deposition Mr. Mulford testified he did not know
if Detective Heffernan had been suspended, and he referred all questions to Chief Leahy. In the
final analysis Leahy concluded that Heffernan was good guy and deserved to be on the force.
There was no discipline, and Heffernan went on to become a homicide detective. Even more
significant is the clear record of the response, or lack of one, at the City Council. After the
appeals court decision was handed down and all rights of appeal to the U.S. Supreme Court had
lapsed a representative of the American Civil Liberties Union, Worcester County Chapter, came
before the City Council to ask for the council's review of police training and supervision in light

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 7

Wierstack. Mr. Mulford and the City Council abdicated their responsibilities when Chief Leahy opposed any efforts to refer the matter to Council's Public Safety Committee. Leahy announced that any referral to the committee would be viewed as vote of no confidence and the entire council chickened out, obeying the dictates of its subordinate – the chief – and abandoning its oversight function.

In the absence of responsible oversight by those who set policy, fund budgets and hire the police chief, the "blue wall of silence" is a pervasive and endemic issue in the Department. It has been described by high ranking members of the department as early as in the 1980's. On October 13, 1981 Captain James Sullivan responded to an internal affairs investigation into a complaint of William Nelson officers had injured him. Capt. Sullivan opined that some of the officers involved had lied in official reports. As you must know, it is crime for an officer of the peace in Massachusetts to lie in an official report. Captain Sullivan noted that: "On the matter of reports it is extremely frustrating to be confronted with lies and cover up on the part of our officers...The reports from all concerned in this investigation leave much to be desired in the matter of truthfulness."

Mr. Mulford was not one to scrutinize questions of police misconduct. For instance, he testified in the case of *Cristino Hernandez v. City of Worcester, Edward P. Gardella, David Reidy and Christopher McInness* that he did not believe that he ever reviewed an internal affairs file until a misconduct event that had fatal consequences for the subject, Cristino Hernandez, on July 5, 1993. Mr. Mulford stated under oath that he did not recall ever taking any disciplinary action before July 6, 1993 against any member of the Police Department. He testified that he did not have a policy dealing with adverse court rulings against members of the department. It is the business of the City Manager to know about events in which citizens complain about abuses. If complaints are not taken seriously this sends a dangerous signal through police ranks.

Your most recent predecessor, the Honorable Thomas Hoover, also demonstrated a hands off approach to issues having to do with police accountability, police oversight and complaints of citizens that police officers had violated their rights. In the Cristino Hernandez case Mr. Hoover agreed with the recommendations of then Chief Edward P. Gardella that no disciplinary action would be initiated against two officers who asphyxiated Mr. Hernandez to death and who perjured themselves in two judicial proceedings. Mr. Hoover agreed with Chief Gardella's recommendations based on an internal affairs investigation of the incident. Mr. Hoover, sought the protection of a Superior Court judge from a subpoena requiring his testimony by signing affidavit in which he claimed he did not know any facts or circumstances of Mr. Hernandez' arrest and death. After an inquest concerning the death of Mr. Hernandez, a judge concluded that, while there was no criminal wrongdoing, there had been an excessive use of force by the two Worcester Police Officers involved. How did the Worcester City Manager react to this troubling conclusion? In a deposition he provided an explanation from which a jury could infer he was, as a policymaker, deliberately indifferent to the issue: "To my knowledge, I never carefully read it, but only scanned Judge Fox's report" he testified. "... I can tell you only that my decision [as to discipline of the officers] was based on the internal affairs investigation and the recommendation

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 8

of the police Chief." This recommendation, according to the record, were reviewed by the Law Department before the investigation was concluded. The IAD's investigation was significant for its conclusion but also for what it failed to consider or even to mention: It ignored horrific physical evidence of abuse.

Mr. Hoover attached no significance to the Judge's finding that excessive force had been used. When asked if he read the coroner's report and had learned that Mr. Hernandez suffered extensive hemorrhaging from a barbaric arrest procedure, Mr. Hoover averred: "I really did not consider it." In other words, he rubber stamped the conclusions of the chief and abdicated his function as chief executive to exercise oversight and control. The IAD inquiry was an example par excellence of a result oriented investigation. But in the end the City had to pay $400,000 to settle the case, in addition to fees for a great many hours of attorneys' time, and it allowed David Reidy to remain on patrol and to injure other people. (He broke the arm of a woman, Lydia Islesias, and was involved in another incident in which a Raymond Dennison sustained a fractured hand and perforated ear drum.)

There have been other cases against the WPD in Federal Court whose outcomes your predeccessors ignored and which I commend to your attention: *Elija Melvin Wreh v. Herbert Campbell, Richard Izbicki and Brian T. Donohue; Carlos Valencia v. Darnell McGeee and City of Worcester* (both U.S. Disctrict Court of Massachusetts cases, filed 1995 and 1999 respectively). In the latter case a person alleged he was assaulted in a bathroom and sustained a 10" lasceration of his head requiring staples. Another example can be found in *Consolo v. George*, 58 F.3d 791 (1st Cir. 1995), which is enclosed. (Exhibit 7) In *Consolo* a jury found the City had been deliberately indifferent to an arrestee's medical needs and ordered the City to pay $90,000.00. On appeal, Judge Young affirmed the jury verdict against the city on grounds that officers violated a prisoner's civil rights by being deliberately indifferent to his medical needs. What happened to the officers involved? Officers Mulvey and George were promoted to detective status. And how did Chief Gardella view this case? He testified in the federal trial of Consolo that he met with both officers Mulvey and George and both fine officers and would not question their truthfulness. Consolo alleged that he had been stomped with boots by various officers and had his pelvic bone broken. Gardella admitted at the trial that he did not know much about Consolo's allegations. Did Chief Gardella or Jeffrey Mulford take citizen allegations of police misconduct seriously? The chief admitted at a deposition that before the suit he had found no wrongdoing in connection with Consolo's arrest, although there had been no investigation of it.

Another instructive case is now in litigation, in which an intoxicated person who claimed to be suicidal and was asking for help was brought to the station on a disorderly conduct charge. *Jaroszuk v. City of Worcester, Lahair; M, Johanson, K, Gray, C, Mita, D, Lamothe, W and Grady J.* Worcester Superior Court, CA No. 02-0293A. When he began to protest and kick inside of the holding cell the person in charge of the booking process (Officer Lamothe) commented on the cell tape something about "fucking drunk case." That officer and Officer Johansen brought Kevin Jaroszuck into a juvenile cell. Jaroszuk was thrown while handcuff wrist to wrist into a metal toilet bowl and sustained six (6) rib fractures. While in the custody of the police department he was transported twice to Umass Memorial Health Care, Inc. and was

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 9

diagnosed with a collapsed lung and had to undergo emergency surgery for a life threatening condition caused by the injuries that he sustained, subcutaneous emphysema. His medical bills exceed $20,000. You would think that, if an ambulance arrives to the Police Department and a prisoner who had arrived at the jail uninjured is admitted to the hospital with a life threatening trauma injuries, that someone in the department would find this to be curious and would inquire into the circumstances of the case and perhaps begin an investigation. You would think that Sgt. James M. Grady, who was in charge of the service division at the time of the injury would have wanted to know what happened. But not at the Worcester Police Department. What conceivable explanation could Sgt. Grady had given for not speaking with Jarozuck about his injuries? Grady, a defendant in this civil rights case for failure to supervise, testified that he did not speak with Jaroszuk because he was told that Jaroszuk did not want to tell other officers what allegedly happened to him. There can be no question, based on the booking tape, that Jaroszuk was being led by Johansen and Lamothe. On the tape the three of them leave the view of the booking room camera and immediately there is a thump or impact sound on the audio and then the voice of an officer (Lamothe or Johansen) saying "sorry" and "fuck head." Your Law Department can provide you with the transcript of the deposition of Sgt.Grady where, at page 159, he professes himself unable to hear this statement on the tape. In any event, there was no investigation until some time after the incident, when this office complained to the police department. The investigation report has been provided to me under protective order of the Superior Court, so I will not discuss it here. Suffice it to note that the IAD found no wrongdoing.

When victims prove police misconduct in court, does that draw the Police Department's attention? No. One internal affairs officer recently has testified that IAD had no records that would allow tracking of civil rights suits. He testified the Law Department was responsible for tracking lawsuits against the City. When asked if he could identify officers against whom lawsuits were brought he testified that he would probably have to look at files of individual officers to find such information. I understand that the department uses a manual filing system for cases of alleged officer misconduct that does not allow for systematic tracking of complaints or for identifying officers who garner a disproportionate share of complaints. IAD records available for 1982 to 1992 attached as Exhibit 8 show that in that period record keeping of misconduct complaints and investigations was primitive. I am unaware of how much it may have improved, if at all. This record, and a more recent compilation by the ACLU of alleged misconduct incidents and investigations (attached as Exhibit 9), are testament to the vigor with which the IAD unearths and uproots abuse of the public by Worcester police officers. These records also suggest that numerous complaints were not disposed of, that is, there was no action either way

None of this is to suggest that all or even most Worcester police officers are guilty of any civil rights violations. But the sad fact is that, while police supervisors and those to whom they should be accountable in your office and in the City Council chambers fail to do their duty, the only protection the public has is the professionalism and conscience of the individual officer. The City makes itself liable to pay for the resulting harms if it allows this climate to persist, where everyone knows that there is little or no restraint but his or her own.

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 10

I urge you to give this issue your most serious consideration, and I thank you for time and effort in addressing this important public safety issue.

Very truly yours,

Héctor E. Piñeiro

Enclosures

cc:

The Honorable Timothy P. Murray, Mayor
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9009

The Honorable Paul P. Clancy, Jr.
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9016

The Honorable Juan A. Gomez
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9023

The Honorable Barbara G. Haller
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9030

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 11

The Honorable Dennis L. Irish
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9047

The Honorable Konstantina B. Lukes
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9054

The Honorable Philip P. Palmieri
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9061

The Honorable Michael C. Perotto
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9078

The Honorable Joseph M. Petty
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9085

The Honorable Frederick C. Rushton
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:   7003 0500 0003 9760 9092

Hon. Michael R. O'Brien, 9/2/04
RE: Jose Betancourt
Page 12

The Honorable Thomas P. White
City of Worcester
City Hall Room 112
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9108

David M. Moore, City Solicitor
City of Worcester
City Hall, Room 301
455 Main Street
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9115

Gerald Vizzo, Chief of Police
Worcester Police Department
9 ½ Lincoln Square
Worcester, MA 01608
RECEIPT NO.:  7003 0500 0003 9760 9122

Mr. Ronald Madnick
Civil Liberties Union of Massachusetts
340 Main Street Suite 717
Worcester, MA  01608